# EXHIBIT



# INTERIOR BOARD OF INDIAN APPEALS

Gary Grenier v. Great Plains Regional Director, Bureau of Indian Affairs

71 IBIA 45 (06/17/2025)

Related Board cases:
    66 IBIA 7
    68 IBIA 151



## United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF INDIAN APPEALS
801 NORTH QUINCY STREET
SUITE 300
ARLINGTON, VA 22203

| | | |
|---|---|---|
| GARY GRENIER, | ) | Order Affirming Decision as Modified |
|       Appellant, | ) | |
| | ) | |
|   v. | ) | |
| | ) | Docket No. IBIA 24-026 |
| GREAT PLAINS REGIONAL | ) | |
| DIRECTOR, BUREAU OF INDIAN | ) | |
| AFFAIRS, | ) | |
|       Appellee. | ) | June 17, 2025 |

    Gary Grenier (Appellant) appealed to the Board of Indian Appeals (Board) from a December 6, 2023, decision (Decision) of the Great Plains Regional Director (Regional Director), Bureau of Indian Affairs (BIA), assessing Appellant $774,625.31 in civil penalties for extracting gravel and other material from Indian agricultural land, Turtle Mountain Off-Reservation Tract Nos. 5065 and M5065, under a lease with a landowner, Carol Delorme, that was void *ab initio* for lack of BIA approval (and could not have been approved by BIA as written).[1]

    In *Grenier II*, the Board vacated and remanded the Regional Director's civil penalties assessment, in part, for further consideration of three issues (while affirming the assessment or dismissing the appeal in remaining part): (1) whether, on remand from *Grenier I*, it was

---

[1] This is Appellant's third appeal to the Board from a decision of the Regional Director concerning Appellant's trespass. In *Grenier v. Great Plains Regional Director*, Docket No. IBIA 20-060, 68 IBIA 151 (2022) (*Grenier II*), the Board affirmed in part, vacated in part, and remanded a July 22, 2020, decision of the Regional Director assessing Appellant $754,642.71 in civil penalties. In *Grenier v. Great Plains Regional Director*, Docket No. IBIA 16-088, 66 IBIA 7 (2018) (*Grenier I*), the Board affirmed BIA's determination that Appellant committed trespass and let stand the Regional Director's decision to vacate and remand the Turtle Mountain Agency Superintendent's (Superintendent) original assessment of $231,205.50. Appellant is challenging the final Departmental trespass determination in Federal court. *Grenier v. U.S. Dep't of the Interior*, No. 3:18-cv-00247-PDW-ARS (D.N.D. filed Nov. 28, 2018); *Grenier v. U.S. Dep't of the Interior*, No. 25-1786 (8th Cir. filed Mar. 18, 2025).

proper under the trespass regulations for BIA to switch its methodology for valuing the removed material from royalty value to retail price (per loose cubic yard (CY)), *see Grenier II*, 68 IBIA at 165-67; (2) whether BIA's 181,660 CY estimate of the volume of the removed material is the compacted or uncompacted (i.e., loose CY) volume, and whether that estimate includes a "swell factor," *see id.* at 167-68; and (3) whether, as Appellant claims, it was improper for BIA to assess loss of profits from farming based on gross profits instead of net profits, *see id.* at 168-69.

In this appeal, *first*, we find that BIA erred by using a retail price of $3.95 per CY to value the material that was illegally removed. We reinstate the Superintendent's original valuation of the material based on the appraised royalty value of $1.50 per CY (which Appellant has conceded is reasonable). BIA's switch to using a retail price, for the express purpose of penalizing Appellant for alleged willful trespass, is not supported by the trespass regulations, which include a treble damages provision that does not depend on willfulness. In *Grenier I*, the Board let stand, as uncontested by any party, the Regional Director's decision not to assess treble damages. BIA cannot now use a retail price for the purpose of imposing a comparable penalty on Appellant ($3.95 per CY compared to $4.50 per CY if damages were trebled).

*Second*, we leave in place BIA's finding that, although its 181,660 CY estimate of the material removed is based on compacted measurements of the gravel pits, considering Appellant's objections, BIA should not apply its estimated 25% swell factor to those measurements. *Third*, we affirm BIA's assessment of the loss of profits from farming. Appellant has not provided evidence to support a different assessment of lost farming profits, much less shown that BIA's assessment based on loss of gross profits will create a windfall as he claims. *Finally*, we either reject or decline to consider arguments raised by Appellant on appeal that the Board should set aside the Decision or dismiss the trespass proceedings against him based on allegations of bias or bad faith, delay, and lack of jurisdiction to assess civil penalties. As a result, after reducing BIA's assessment by the difference between the retail price and royalty value of the material illegally removed, we affirm BIA's assessment (as modified by our decision) in the amount of $329,558.31.

## Legal and Factual Background

The American Indian Agricultural Resource Management Act (AIARMA), 25 U.S.C. § 3701 *et seq.*, required the Secretary of the Interior to promulgate regulations that: establish civil penalties for trespass on Indian agricultural lands, *id.* § 3713(a)(1); designate responsibility within the Department of the Interior (Department) for the investigation of such trespass, *id.* § 3713(a)(2); and set forth responsibilities and procedures for the assessment and collection of civil penalties, *id.* § 3713(a)(3). The Act and its

implementing regulations authorize BIA to assess and collect the following restoration-based damages and treble damages for the products or property removed in a trespass:

> (a) Collection of the value of the products illegally used or removed plus a penalty of double their values;
> (b) Costs associated with any damage to Indian agricultural land and/or property; [and]
> (c) The costs associated with enforcement of the regulations, including field examination and survey, damage appraisal, investigation assistance and reports, witness expenses, demand letters, court costs, and attorney fees . . . .

25 C.F.R. § 166.812(a)-(c);[2] *see* 25 U.S.C. § 3713(a)(1)(A)-(C). BIA will determine "the value of the products or property illegally used or removed based upon a valuation of similar products or property." 25 C.F.R. § 166.814. BIA will determine the damages to Indian agricultural land "by considering the costs of rehabilitation and revegetation, loss of future revenue, loss of profits, loss of productivity, loss of market value, damage to other resources, and other factors." *Id.* § 166.815.

Proceeds recovered under § 166.812 may be distributed to: (1) "[r]epair damages of the Indian agricultural land and property"; (2) "[r]eimburse the affected parties, including the permittee for loss due to the trespass, as negotiated and provided in the permit"; and (3) "[r]eimburse for costs associated with the enforcement of [the trespass regulations]." *Id.* § 166.818.

Facts surrounding Appellant's trespass and BIA's damages assessment are detailed in *Grenier I*, 66 IBIA at 8-13, and *Grenier II*, 68 IBIA at 153-62. In *Grenier II*, the Board vacated and remanded BIA's assessment for further consideration of the three issues described above. In remaining part, the Board affirmed that assessment or dismissed Appellant's claims. 68 IBIA at 175.

In this appeal from the Regional Director's December 6, 2023, decision, Appellant filed a notice of appeal and included a detailed statement of reasons for the appeal, a request for expedited consideration, and a request for a hearing.[3] Notice of Appeal, Jan. 10, 2024.

---

[2] The regulations also authorize the assessment of expenses related to the impoundment of livestock and "[a]ll other penalties authorized by law." 25 C.F.R. § 166.812(d)-(e).

[3] Before filing the appeal, Appellant submitted a motion for the issuance of subpoenas, which the Board denied for lack of authority by letter dated October 13, 2023. In a January 18, 2024, pre-docketing notice, the Board denied Appellant's request for a hearing as premature. The Board noted that, after the conclusion of briefing on the merits, if
(continued…)

Appellant also filed an opening brief. Opening Brief (Br.), June 26, 2024. The Regional Director filed an answer brief, Answer Br., Aug. 5, 2024, to which Appellant replied, Reply Br., Aug. 27, 2024.[4] In addition, by order dated September 23, 2024, the Board allowed the Regional Director to file a surreply brief, *see* Surreply Br., Sept. 16, 2024, and allowed Appellant to respond, *see* Response to Surreply Br., Oct. 1, 2024. By order dated October 15, 2024, the Board granted Appellant's motion for expedited consideration (while advising the parties that the Board may simultaneously consider other pending appeals).

## Standard of Review

The Board exercises *de novo* review over questions of law and the sufficiency of the evidence to support a BIA decision. *Grenier II*, 68 IBIA at 163; *Grenier I*, 66 IBIA at 13. The Board will not substitute its judgment for BIA's in matters of discretionary decision making, but it will review the decision to determine whether it comports with the law, is supported by the administrative record, and is rational and not arbitrary or capricious. *Grenier II*, 68 IBIA at 162; *Grenier I*, 66 IBIA at 13. Appellant bears the burden of proving error in BIA's decision. *Grenier II*, 68 IBIA at 163; *Grenier I*, 66 IBIA at 14.

The Board's scope of review is ordinarily "limited to those issues that were before the . . . BIA official on review." 43 C.F.R. § 4.318. Therefore, we ordinarily will not consider arguments or evidence presented for the first time on appeal to the Board that could have been, but were not, presented to the Regional Director. *Grenier II*, 68 IBIA at 163. The Board lacks authority to adjudicate the constitutionality of statutes and regulations. *State of Minnesota v. Acting Midwest Regional Director*, 47 IBIA 122, 125 (2008).

## Discussion

I.   Damages for the Material Removed – Royalty vs. Retail Value

In *Grenier II*, the Board remanded BIA's assessment of damages for Appellant's unauthorized removal of gravel from Indian agricultural land for further consideration.

---

(…continued)
warranted, the Board could order supplemental briefing or refer the matter for a hearing. *See* 43 C.F.R. § 4.337(a). The Board finds that this matter is suitable for resolution without further briefing or a hearing.

[4] The Regional Director also filed a request to limit disclosure of information under 43 C.F.R. § 4.31(d), which the Board granted by order dated May 15, 2024.

A central issue was the proper method for valuing the removed material. AIARMA and its implementing regulations allow BIA to collect civil penalties for trespass in the amount of "the value of the products illegally used or removed plus a penalty of double their values" (that is, treble damages). 25 U.S.C. § 3713(a)(1)(A); 25 C.F.R. § 166.812(a). The regulations require BIA to determine the "value of the products" based upon a "valuation of similar products or property." 25 C.F.R. § 166.814.

Initially, the Superintendent measured the value of this gravel at $1.50 per CY. *Grenier II*, 68 IBIA at 154. That value was based on an appraisal prepared by the Bureau of Land Management (BLM) of the minimum "royalty" value of similar gravel, that is, the amount that typically would have been paid to the landowner for the right to extract this gravel from the land. *Id*. at 166. The royalty value does not include the costs of extracting the gravel, transporting it, or processing it. *See id*. Nor does it include any measure of the profits that the trespasser might have realized by selling finished gravel.

On remand from *Grenier I*, the Superintendent asked the Department's Appraisal and Valuation Services Office (AVSO) to prepare a new appraisal. *Id*. at 157. AVSO returned an appraisal of $3.75 per CY, based on the average retail price for the period from 2009 to 2012, instead of the royalty value. *Id*. Unlike the royalty value, the retail price includes not only the amount that would have to be paid to the landowner for the right to extract the gravel, but also the costs of extracting, transporting, and processing the gravel, as well as whatever profit the producer was able to realize. *See id*. at 166. The Superintendent used this retail value to calculate damages for this trespass, stating that it would yield "a more equitable and accurate" valuation than the original royalty-based valuation. *Id*. at 165.

It was only after reviewing the AVSO retail-price appraisal that the Regional Director identified purported flaws in BLM's royalty valuation. *See id*. at 166. Before that, the Regional Director had also agreed with the original value of $1.50 per CY based on the royalty rate (although he did not explain that figure's accuracy and vacated and remanded the damages assessment). *Id*. at 164. The only thing that changed since the Regional Director's original agreement with the use of a royalty value was that he had reversed the Superintendent's prior assessment of treble damages. *See Grenier I*, 66 IBIA at 13.

Nonetheless, for the first time on appeal in *Grenier II*, the Regional Director argued that a royalty-based valuation was inappropriate because Appellant lacked a lease. 68 IBIA at 166. We rejected that argument, explaining that "the absence of a lease, standing alone, does not preclude the assessment of trespass damages based on the royalty value of the material removed or based on its market value less production expenses." *Id*. at 167 (citing *Heirs and Successors in Interest to Mose Daniels v. Eastern Oklahoma Regional Director*, 55 IBIA 139 (2012)). We then vacated and remanded BIA's calculation of damages because BIA

had failed to adequately justify its shift from using royalty value to retail price. 68 IBIA at 151-52; *see id.* at 165 ("BIA's decision to switch from using royalty value to retail price is neither adequately explained nor supported in the record . . . .").

Now, on remand from *Grenier II*, the Regional Director has again concluded that it is appropriate to value this gravel based on its retail price.[5] Decision, Dec. 6, 2023 (Administrative Record (AR) III, Tab 6, at 108-111).[6] The Regional Director concedes that, "[i]f we were to use royalty value as the basis for damages, this approach would 'attempt to make the injured party whole . . . .'" *Id.* at 109 (citation omitted). But he contends that making the landowners whole is not enough here because this was a "willful" trespass, not an "innocent" one, as evidenced by the fact that Appellant did not have a BIA-approved lease. *Id.* at 110. And because it was allegedly a willful trespass, the Regional Director argues that the value of the gravel must be set at the higher retail price so that these damages will not only compensate the landowners, but also have a "deterrent value" and ensure that Appellant does not "retain any profits resulting from a sale of the minerals." *Id.* (internal quotation marks and citations omitted); *see also* Answer Br. at 15. Thus, according to the Regional Director, the value of the gravel must be set at its retail price because that value is (1) compensatory, making the landowner whole; (2) punitive, deterring future trespass; and (3) confiscatory, disgorging unlawful profits.

These arguments find no direct support in AIARMA or its regulations. As we explain further below, the statute and the regulations do not distinguish between willful and innocent trespass and do not suggest that the value of the product removed should be set to deter future trespass or disgorge unlawful profits. The Act and its regulations do allow "a penalty" of treble damages, but BIA did not seek treble damages here. *Grenier I*, 66 IBIA at 13, 21; Decision (AR III, Tab 6, at 109) ("Here, BIA is not assessing treble damages.").

Nonetheless, BIA argues that the statute and its regulations do not explicitly address these issues, and thus BIA has discretion "to use various methods of calculating the value of the gravel Appellant illegally removed, including royalty or retail value." Answer Br. at 6-7. BIA then contends that its decision to value this gravel at its retail price, with no offset for

---

[5] The Regional Director also increased the valuation from $3.75 per CY to $3.95 per CY, after omitting data from 2009 and 2012, before and after Appellant conducted mining activities on the premises.

[6] The AR is organized in volumes labeled IA, IB, II, and III, corresponding to Appellant's three appeals to the Board. The documents are organized behind numbered tabs and are Bates numbered. Citations to documents in the AR will identify the volume followed by the tab number and Bates page number(s). For example, "AR III" is the "Gary Grenier Appeal III" binder.

Appellant's costs, is supported by analogous examples from the common law and a BLM policy memorandum. *See id.* at 7-9; Decision (AR III, Tab 6, at 109-10, 112-13).

We are not persuaded by BIA's theories. *First*, BIA cites to various valuation and damages schemes applied under the common law for various kinds of trespass. *See, e.g.*, Decision (AR III, Tab 6, at 112) (discussing common law damages for intentional trespass to timber or minerals detachable from the land); *id.* at 112-13 (discussing the "mild" and "harsh" rules for damages applied under the common law for trespass and conversion of oil or minerals); Answer Br. at 9. None of the cited authorities address the valuation of gravel (but rather timber, oil, or other kinds of trespass), and it appears that the common law has laid down "[n]o hard-and-fast rule . . . as to the proper measure of damages for the wrongful taking of . . . gravel from land." R.A. Vinluan, Annotation, Measure of Damages for Wrongful Removal of Earth, Sand, or Gravel from Land, 1 A.L.R. 3d 801, at *2 (2025). In any event, the common law does not apply here because these damages are statutory and defined by AIARMA and its regulations.

*Second*, BIA relies on a BLM policy memorandum interpreting BLM's trespass regulation at 43 C.F.R. § 9239.5-2, which governs "oil trespass in a State where there is no State law governing such trespass." *See* Decision, Exhibit A (Enforcement Tools for Mineral Trespass) (AR III, Tab 6, at 117). That regulation, promulgated by BLM under the Federal Oil and Gas Royalty Management Act (FOGRMA), 30 U.S.C. § 1701 *et seq.*, does not apply here, but BIA nonetheless argues that it is "helpful to examine how other federal agencies treat the question." Decision (AR III, Tab 6, at 109); *see id.* ("While persuasive only, this guidance is consistent with the approach in our July 2020 Decision."). In this policy memorandum (and the cited regulation), BLM sets the damages for "innocent" trespass at "the value of the oil or gas produced by the trespasser minus the costs of production" and the damages for "willful" trespass at "the value of the oil or gas produced without deducting the costs of production." Enforcement Tools for Mineral Trespass (AR III, Tab 6, at 117); *see also* 43 C.F.R. § 9239.5-2.

This too is unpersuasive. BLM's policy does not explicitly address whether a royalty or retail value should be used to assess trespass damages (referring only to "the value of the oil or gas produced"), nor does it provide for treble damages. Instead, the policy draws a distinction between "innocent" and "willful" trespass for the purpose of determining whether the costs of production should be credited against liability.[7] However, neither

---

[7] This is not how BLM treats all trespass, but only one possible damages scheme among many adopted by BLM for different kinds of trespass: BLM's regulations distinguish between trespass for timber, unlawful enclosures or occupancy, grazing, ores, oil, coal, turpentine, and rights-of-way. *See, generally*, 43 C.F.R. Part 9239. BLM assesses damages
(continued…)

AIARMA nor its implementing regulations require a showing of intent or willfulness to assess damages or treble damages. *See Grenier I*, 66 IBIA at 17-18 (rejecting Appellant's contention that "BIA must show he 'intend[ed] to enter the land without consent' of a landowner") (citations omitted). To the contrary, "trespass" includes any unauthorized use of Indian land, willful or innocent. *See* 25 C.F.R. §§ 162.101, 162.106, 166.4, 166.800, 166.801(a). And neither AIARMA nor its regulations direct BIA to assess the value of removed products or property based on innocence or willfulness. Instead, AIARMA and its regulations give BIA a different tool to penalize and deter trespass: treble damages. Thus, the policy described in BLM's memorandum does not apply here.

*Third*, BIA's proposed punitive and confiscatory valuation of this gravel conflicts with the provision for treble damages in AIARMA and its implementing regulations. While AIARMA and its regulations allow for punitive damages, they do not include those punitive damages in the value of the products illegally removed. Rather, they require damages to be based on the value of the product, adding "a penalty of double [the products'] values." 25 U.S.C. § 3713(a)(1)(A); 25 C.F.R. § 166.812(a). This essentially rules out BIA's theory of valuation here because, if the value of the product itself is already set at a punitive or confiscatory price—such as by valuing *in situ* gravel as finished gravel—then the trebling of those values to calculate damages would not only treble the product's value (as provided in the statute), but it would also treble the penalties. AIARMA and its regulations allow BIA to assess treble *damages*, but nothing in the statute or its regulations suggests that trespassers—even willful trespassers—are subject to treble *penalties*. We recognize, of course, that BIA did not apply treble damages here. But if BIA's theory of damages were correct, then in another case it could impose penalties through valuation and then add statutory penalties on top. We find no authority in AIARMA or its regulations for such triple-counting of penalties.

For these reasons, we reject BIA's arguments here and conclude that it has not articulated a rational basis for its use of retail price to value this gravel. Following the Board's decision in *Mose Daniels*—and consistent with BIA's position in that case—we conclude instead that proper value for this gravel was the value of similar products *in situ*, which, in this case, means the royalty value (since the gravel had not yet been extracted when it was taken). *Mose Daniels*, 55 IBIA at 156-57.

---

(…continued)
for trespass to timber, for example, at "[t]wice the fair market value of the resource at the time of the trespass when the violation was nonwillful, and 3 times the fair market value at the time of the trespass when the violation was willful," unless "State law provides stricter penalties . . . ." 43 C.F.R. § 9239.1-3(a)(3).

In *Mose Daniels*, BIA assessed treble damages under AIARMA for the unauthorized extraction of fill material and destruction of trees. Although the appellants argued that a different statute (the National Indian Forest Resources Management Act (NIFRMA), 25 U.S.C. § 3101 *et seq.*) should govern, the Board found that the valuation methodology—whether based on "similar products or property" (AIARMA) or "highest stumpage value obtainable" (NIFRMA)—appeared functionally the same.[8] *Mose Daniels*, 55 IBIA at 149, 157 (construing 25 C.F.R. §§ 166.814 and 163.29(a)(3)(i)).

In that case, BIA rejected values that included production costs, adopting a $1.25 per CY royalty-based value for the fill material. *Id.* at 156-57. The Board affirmed BIA's valuation as reasonable and supported by the evidence. *Id.* The Board also upheld BIA's firewood-based (i.e., price per cord) valuation of the destroyed trees, rejecting a valuation of trees prepared for sale in a nursery because it was inconsistent with the "similar products" and "stumpage value" standards.[9] *Id.* at 158. In the current case, BIA attempts to distinguish *Mose Daniels* on the basis that treble damages were assessed there but not here. Decision (AR III, Tab 6, at 109). But that distinction is irrelevant. The regulations do not afford BIA discretion to choose between assessing damages based on the royalty value of *in situ* gravel and trebling those damages, as it did in *Mose Daniels*, or treating *in situ* gravel as finished gravel and assessing damages based on the retail price, as it did here. The Regional Director's decision to vacate the treble damages assessment went unchallenged in *Grenier I* and stands. 66 IBIA at 13, 21. BIA cannot now circumvent its decision not to assess treble damages by substituting a retail-price valuation that effectively achieves the same outcome.

We are aware of no prior case in which BIA asserted such authority under AIARMA and its regulations. The Board has held that, "because persons dealing with a Federal agency are entitled to rely on prior administrative interpretations, any change in the agency's position must be fully and clearly explained in order to show that the change is not arbitrary or capricious." *Stockbridge-Munsee Community v. Acting Minneapolis Area Director*, 30 IBIA 285, 289 (1997) (internal quotation marks and citation omitted). We remanded in *Grenier II* because the Regional Director had failed to provide that explanation. For the foregoing reasons, we now conclude that BIA's explanation that it relied on retail price due

---

[8] Like AIARMA and its regulations, NIFRMA and its regulations do not require a showing of intent or willfulness to assess damages or treble damages. 25 C.F.R. § 163.29(a)(3)(i); *Koontz v. Northwest Regional Director*, 55 IBIA 177, 185 (2012).

[9] The Board explained that the "stumpage value" is the "amount a party would pay for the *right to extract* the products from the land (a royalty) and thus does not include costs of extraction, transportation, or processing." 55 IBIA at 149 n.12 (citing 25 C.F.R. § 163.1).

to alleged "willful" trespass is inconsistent with both the governing statute and regulations and Board precedent.[10]

In *Grenier II*, we also directed BIA to address Appellant's challenges to BLM's $1.50 per CY royalty appraisal, including evidence of a $1.00 per CY rate that was obtained from the Rolette County Deputy Auditor. 68 IBIA at 167. On remand, the Regional Director dismissed the $1.00 per CY rate as reflecting the consumer price for a buyer who crushes the material on site and then later sells it for a higher price, rather than a royalty rate. Decision (AR III, Tab 6, at 111). On appeal, Appellant clarified that he submitted this evidence to corroborate—not undermine—the reasonableness of the $1.50 per CY royalty value. Opening Br. at 27. Thus, while Appellant presented evidence suggesting the rate could be lower, he effectively conceded that $1.50 per CY was reasonable. And, although the Regional Director previously questioned that valuation's accuracy because it might have been based on data that postdated Appellant's trespass, *see Grenier II*, 68 IBIA at 160, BIA has provided no evidence justifying a higher royalty rate.

For the reasons above, the Regional Director's decision to apply a $3.95 per CY retail price cannot be sustained. The original $1.50 per CY royalty valuation—uncontested in *Grenier I*—was reasonable and substantiated in the record. Accordingly, we reinstate the $1.50 per CY royalty value.

II.   Damages for the Materials Removed – Compacted vs. Uncompacted Volume and the Swell Factor

In *Grenier II*, we also remanded with instructions for BIA to clarify whether its 181,660 CY estimate of the volume of material illegally removed—in which Appellant had not alleged error—was calculated using compacted or uncompacted measurements, and to identify any "swell factor" applied. 68 IBIA at 157, 160, 167-68. BIA's estimate is based on an April 30, 2019, report by Uintah Engineering (Uintah), which surveyed two gravel pits and several stockpiles and berms on the property in 2013-2014. *Id.* at 157. Notably, BLM's royalty appraisal had cited a statement by Uintah that a 30% swell factor could be applied to convert bank (i.e., *in situ*) cubic yards to loose cubic yards. *Id.* at 155.

---

[10] To be clear, we hold only that, in this case and on these facts, BIA has not articulated a coherent theory of damages that both justifies the use of the retail price to value this gravel and is also consistent with AIARMA, its regulations, and the Board's precedent. We do not hold that all valuations must be based on the royalty value or the market value less production expenses. We also do not hold that BIA has no discretion in valuation of the products or property illegally used or removed. And we express no opinion on the merits of BIA's uncontested decision not to assess treble damages in this case.

On remand, BIA sought BLM's guidance on the appropriate swell factor. A BLM geologist visited the site in October 2022 and collected samples from five locations. According to a November 30, 2022, letter from BLM's Montana/Dakota State Office Program Lead for Mineral Materials, gravel typically swells by 20 to 30 percent, with the samples collected showing swell factors ranging from 12 to 56 percent. Letter from BLM Program Lead to BIA Superintendent (AR III, Tab 13, at 215-16). The Program Lead cautioned that determining an exact swell factor for the entire site was unlikely and recommended using either the range from the samples or a median value of 25%. *Id.*

In May 2023, BIA obtained updated surveys from Uintah, which applied a 25% swell factor to the gravel pit measurements. *See* Answer Br. at 18; Updated Uintah Plats, May 1, 2023 (AR III, Tab 15, at 227-28). Consistent with 25 C.F.R. § 2.21(b) (2022), BIA provided Appellant 10 days to comment on the supplemental information. Letter from Regional Director to Counsel for Appellant, May 11, 2023 (AR III, Tab 14, at 220). Appellant objected that the swell factor was speculative due to the lapse of time since Appellant's mining activity ceased in 2012 and that, because the stockpiles and berms were already measured in an uncompacted state, any swelling had already been accounted for. Letter from Counsel for Appellant to Regional Director, May 26, 2023 (AR III, Tab 11, at 203-04).

In the Decision, the Regional Director clarified that the 2019 Uintah report did not apply a swell factor and acknowledged that doing so would have yielded a better estimate of the material removed. AR III, Tab 6, at 111. The report measured the gravel pits as compacted volumes (226,320 CY) and the stockpiles and berms as uncompacted volumes (44,660 CY). *See* Answer Br. at 18. Therefore, to determine how much material had been removed from the premises, one would apply a swell factor to the gravel pit measurements to estimate their uncompacted volume and then subtract the volume of the stockpiles and berms. *See id.* at 16. Without adjusting for swelling, the amount of removed material would be underestimated. *See id.* at 18-19.

Nonetheless, after reviewing Appellant's objections, the Regional Director ultimately chose not to apply a swell factor to the compacted volume of the gravel pits. Decision (AR III, Tab 6, at 111). As a result, Appellant's claim that any swell factor application would have relied on "speculative and spoiled information," Opening Br. at 33, is moot.

On appeal, Appellant seeks to invalidate the entire 181,660 CY estimate, contending that it failed to account for erosion and material removed by a third party, Melvin Delorme, Jr. (Melvin). *Id.* at 34; Reply Br. at 2. We decline to consider the erosion argument

because it was raised for the first time on appeal.[11]  *See* 43 C.F.R. § 4.318; *Goodwin v. Pacific Regional Director*, 60 IBIA 46, 55 (2015).  As noted above, Appellant did not previously challenge the 181,660 CY estimate.  As for Appellant's concern regarding gravel that Melvin allegedly removed, we previously found in *Grenier I* that the claim was speculative and not ripe for review.  66 IBIA at 21-22.  The Superintendent later explained that the volume used in the damages calculation was unaffected because Uintah's 2013-2014 surveys occurred before Melvin's alleged actions.  *See* Letter from Superintendent to Appellant, Nov. 15, 2019 (AR III, Tab 42, at 660).  Because *Grenier II* did not remand this issue, we decline to revisit it here.  Thus, we let stand BIA's 181,660 CY estimate of the volume of the material illegally removed.

III.   Loss of Farming Profits – Net vs. Gross Profit

In *Grenier II*, we vacated and remanded BIA's assessment of damages for lost farming profits because BIA had based its assessment on gross profits without addressing Appellant's argument that this approach failed to account for the costs and expenses of baling alfalfa.  68 IBIA at 168-69.  Appellant contended that using average crop prices compiled by the U.S. Department of Agriculture, National Agricultural Statistics Service (NASS), overstated the damages, as it did not reflect the net profit a landowner would have earned after production costs.  *Id.*

On remand, the Regional Director acknowledged Appellant's claim that awarding damages based on gross profits could result in a "windfall" for the Indian landowners. Decision (AR III, Tab 6, at 113).  However, BIA's response confused two distinct issues. Rather than directly address the costs associated with farming and baling alfalfa, BIA referenced Appellant's expenditures related to gravel extraction—a separate matter relevant only to the valuation of the removed material.  *See id.* ("We recognize that Appellant expended costs in his gravel production activities . . . .  Gravel is a non-renewable natural resource . . . [and] the Indian landowners will never get the resource back—it is gone."); *see also* Answer Br. at 22.  Appellant likewise conflated the issues, arguing broadly that his costs "must be accounted for."  Opening Br. at 30.

Nonetheless, the burden remained on Appellant to show error in BIA's assessment of lost farming profits.  He has not done so.  As the Board explained in *Grenier II*, Appellant offered no actual data regarding net profit from alfalfa farming.  Instead, he proposed reducing the gross profit calculation by two-thirds, based on a purported local custom whereby one-third of the crop goes to the landowner and two-thirds to the party

---

[11] Nor has Appellant submitted any evidence of the extent of the alleged erosion.

who bales the hay. 68 IBIA at 168; *see* Affidavit of Gary Grenier, Nov. 9, 2020 (AR III, Tab 31, at 376).

While the Board left open the question of whether such a local custom could serve as a proxy for calculating net profits, we noted Appellant's failure to submit any supporting evidence for applying the purported custom to this case beyond his own affidavit. He presented no documentation to show that the custom was followed during the three decades that he allegedly farmed the land, nor did he explain why the 2010 unapproved lease—central to the trespass proceedings—provided instead for a lump-sum rental payment. *Grenier II*, 68 IBIA at 169 n.20.

On appeal, Appellant again asserts that local custom mandates reducing alfalfa-related profit estimates by two-thirds. Opening Br. at 29. We now reject that claim as unsupported. In his affidavit, Appellant maintains that, as the individual who farmed the land for 30 years, he—not the landowners—should receive any lost agricultural profits. AR III, Tab 31, at 376. But Appellant had no approved lease authorizing him to farm (or otherwise use) the land during the relevant period, and therefore had no lawful right to bale alfalfa or claim the resulting profits. Moreover, Appellant concedes in his affidavit that when a landowner bales alfalfa directly, they retain the "full amount of profits." *Id*. Yet he has submitted no evidence of the actual costs a landowner (or third-party contractor) would incur to bale alfalfa, nor any documentation supporting the application of his suggested two-thirds offset in this case.

Under these circumstances, we conclude that Appellant has not demonstrated error in BIA's assessment of lost farming profits. And he has provided no factual basis to show that the use of gross profit estimates created an unwarranted windfall to the landowners. Accordingly, we affirm BIA's assessment.[12]

IV.   Alleged Bias, Delay, and Lack of Jurisdiction

Additionally, Appellant argues that the Board should set aside the Decision or dismiss the trespass proceedings on the grounds of bias or bad faith, unreasonable delay,

---

[12] Appellant's claim that the landowners will receive a windfall is also undercut by BIA's decisions not to assess lost profits after 2018 and the limited scope of its restoration plan. *See Grenier II*, 68 IBIA at 171 (discussing BIA's assessment of the costs of rehabilitation and revegetation); Answer Br. at 22 (noting that the damages for lost profits cover the period 2010-2018 and that the land has not been reclaimed). The claim is further undercut by BIA's decisions not to apply a swell factor, seek treble damages, or assess interest.

and lack of jurisdiction. Opening Br. at 17; Reply Br. at 5; Response to Surreply Br. at 1-3. We address each of these arguments in turn.

Although we conclude that BIA erred in assessing damages based on retail value—a methodology premised on an incorrect interpretation of the applicable trespass regulations—we find no indication that the error results from improper bias or bad faith. Rather, the record shows that BIA misapplied the legal standards governing damages under the relevant regulations. Moreover, as noted above, other aspects of BIA's damages appear conservative and may, if anything, understate the value of the losses. *See supra* at 57 n.12. Appellant's trespass here was not trivial or *de minimis*: to put it in perspective, BIA estimates that Appellant removed enough gravel to fill more than 55 Olympic size swimming pools.[13] Accordingly, we find no basis to set aside the Decision based on alleged bias or bad faith. *See also Grenier II*, 68 IBIA at 174 (rejecting bias allegations and concluding that Appellant's due process rights were adequately protected through the Department's administrative review process, including appeal rights to the Board).

Nor do we find any basis to set aside the Decision or dismiss the trespass proceedings based on delay. The trespass regulations provide that BIA will "[r]espond to alleged trespass in a prompt, efficient manner." 25 C.F.R. § 166.801(b). Here, the Board issued its decision in *Grenier II* in June 2022. In response, BIA obtained additional information regarding a remanded issue from third parties in November 2022 and May 2023. After providing Appellant an opportunity to comment under 25 C.F.R. § 2.21(b), the Regional Director issued the Decision in December 2023. As the Regional Director correctly notes, had Appellant believed that BIA's post-remand action was unduly delayed, his remedy was to pursue an appeal for inaction under 25 C.F.R. § 2.8.[14] Answer Br. at 24 (citing *Grenier II*, 68 IBIA at 174); *see also* Order, *Grenier v. U.S. Dep't of the Interior*, No. 3:18-cv-00247-PDW-ARS (D.N.D. Jan. 17, 2025) (denying Appellant's latest motion dismiss the administrative proceedings under the Administrative Procedure Act).

Appellant also argues that this administrative proceeding is constitutionally invalid in light of the Supreme Court's recent decision in *Securities & Exchange Commission v. Jarkesy*, 603 U.S. 109 (2024). According to Appellant, *Jarkesy* prohibits administrative agencies

---

[13] Wikipedia, Orders of Magnitude (Volume), https://en.wikipedia.org/w/index.php?title=Orders_of_magnitude_(volume)&oldid=1288074182 (last accessed June 17, 2025).

[14] BIA's administrative appeal regulations were amended effective September 8, 2023. 88 Fed. Reg. 53774 (Aug. 9, 2023). Our citations to those regulations are to the previous version. Under 25 C.F.R. Part 2 as amended, the Board has no jurisdiction over appeals from alleged inaction of BIA officials.

from adjudicating cases that implicate traditional common-law rights, such as claims for damages, without a jury trial.  Reply Br. at 6; *see also* Response to Surreply Br. at 2-3.

Appellant's argument misapplies *Jarkesy*.  In that case, the Supreme Court held that the SEC could not impose civil penalties for securities fraud through in-house administrative law judge proceedings because the Seventh Amendment to the U.S. Constitution guarantees a jury trial in Federal court when traditional legal rights are at stake (i.e., those that historically would have been enforced in a court of law as opposed to a court of equity).  As the Regional Director points out, however, the Court in *Jarkesy* reaffirmed that matters involving the "public rights" doctrine—including the Government's regulation of "relations with Indian tribes"—may be adjudicated by agencies without a jury trial.  Surreply Br. at 2-3 (citation omitted).  BIA's authority to assess civil penalties under AIARMA and its implementing regulations squarely fit within this public rights framework.  *See Jarkesy*, 603 U.S. at 130 (citing *United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011)); Order at 10 n.3, *Grenier v. U.S. Dep't of the Interior*, No. 3:18-cv-00247-PDW-ARS (D.N.D. Jan. 17, 2025).

To the extent Appellant argues that AIARMA or the Department's implementing regulations are unconstitutional, we must decline to consider that argument.  The Board lacks the authority to declare an act of Congress or a duly promulgated Departmental regulation invalid.  *See Estate of Evan Gillette, Sr.*, 22 IBIA 133, 140 (1992).  Accordingly, we do not consider Appellant's constitutional challenge under *Jarkesy*, which is beyond the scope of the Board's authority.

Thus, in sum, we affirm BIA's final assessment with modifications to part IV of the Decision as follows (with the Board's modifications underlined):

- Products or Property Removed, 25 C.F.R. §§ 166.812(a), 166.814: $272,490.00
- Loss of Farming Profits, 25 C.F.R. §§ 166.812(b), 166.815: $53,939.31
- Costs of Rehabilitation of Land, 25 C.F.R. §§ 166.812(b), 166.815: $46,629.00[15]
- Costs Associated with Enforcement of Regulations, 25 C.F.R. §§ 166.812(c), 166.816: $2,500.00
- Consideration Paid to Carol Delorme: ($46,000.00)

TOTAL: $329,558.31

---

[15] In *Grenier II*, the Board did not find it necessary for BIA to have decided whether Appellant would be permitted to perform reclamation work himself before the Board could decide Appellant's challenges to that damages assessment.  68 IBIA at 172.  Nor was a decision on that issue necessary for the Board to decide this appeal.

**Conclusion**

Therefore, pursuant to the authority delegated to the Board of Indian Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the Regional Director's December 6, 2023, decision is affirmed as modified herein.

I concur:

\_\_\_\_\_// original signed_____       \_\_\_\_\_//original signed_____
Thomas A. Blaser                                          James A. Maysonett
Chief Administrative Judge                         Administrative Judge